IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| CARL W. STOKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 2:10cv512-MHT |
| ALFA MUTUAL INSURANCE | ) | (WO) |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Carl W. Stokes brings this federal employment-discrimination action pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e to 2000e-17, and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, against defendant Alfa Mutual Insurance Company. Stokes, a white male, claims that Alfa discriminated against him because of his race and sex by giving him a less-than-favorable performance review and then retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Stokes has

since voluntarily dismissed his race-discrimination and sex-discrimination claims.  Now pending before the court is Alfa's motion for summary judgment on Stokes's remaining retaliation claim.  For the reasons that follow, that motion will be granted.


## I.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The court must view the admissible evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).


## II.

Stokes is an accountant.  He has been employed by Alfa in that capacity since February 26, 2001.  His 2008

performance evaluation characterized his overall work as "meets expectations minus."[1]  That review entitled him to a 2.75 % raise, a somewhat smaller increase than he would have earned with a better evaluation.  Believing that his low marks were motivated by animus towards white males, rather than by his actual performance, Stokes filed a charge of discrimination with the EEOC.

Alfa received notification of Stokes's allegations on April 29, 2009.  In his retaliation claim, Stokes submits that Alfa responded to that charge by initiating a harassment campaign against him.

Stokes identifies seven behaviors that he considers unlawful retaliation.[2]  First, Stokes submits that, on the

_____

1.  Stokes has been "satisfied" with his three most recent evaluations, which took place in January 2009, January 2010, and January 2011.  Stokes Dep. 18:4-19:10, attachment to Submission in Supp. of Mot. for Summ. J. (Doc. No. 64).

2.  Stokes has characterized his retaliation claim in slightly different (but substantially overlapping) ways during the pendency of this action.  The court relies primarily on the characterization contained in Stokes's response to Alfa's motion for summary judgment, but has
(continued...)

3

morning of April 29, 2009, he was called into Chief
Accounting Officer Ralph Forsythe's office and berated
for submitting a hundreds-of-pages-long response to his
2008-performance review.

Second, Stokes alleges that he lacked the same
flexibility in altering his scheduled work hours that
Alfa afforded its other employees.  Instead, he was held
to a 40-hour week and forced to have his vacation time
pre-approved.

Third, Stokes purports to have been generally
subjected to a "cold" work environment.  For example, on
December 7, 2010, his direct supervisor, Mark Blackwell,
was "not happy" that he had requested personal time off
to facilitate the installation of DirectTV at his home.
Stokes Aff. 9-10, attachment to Resp. in Opp'n to Mot.
for Summ. J. (Doc. No. 72).  Stokes also alleges that, in
August 2010, his coworker Donna Delong "raised her voice"

─────────────────

2.   (...continued)
also reviewed and considered those allegations contained
elsewhere in the record.

4

and "screamed" at him in Blackwell's presence, but Blackwell "said nothing" in his defense.  <u>Id</u>. at 10. Similarly, after Stokes sent Blackwell an e-mail complaining about the quality of Delong's work, her allegedly inappropriate behavior, and what he viewed as the preferential treatment she was receiving, Delong "stopped speaking" to him and "would not respond to [his] e-mails."  <u>Id</u>. at 11.

Fourth, Stokes alleges that his work product was unduly scrutinized.  His supervisors would often send him e-mails relaying questions that "should have been obvious" and therefore should not have required his attention.  <u>Id</u>. at 2-3.  Stokes submits that these e-mails were sent with the intention of "harassing" him or "trick[ing him] into doing something to violate procedures."  <u>Id</u>.  Similarly, Blackwell frequently e-mailed Stokes to inquire about the status of certain pending assignments, even when Stokes had previously told Blackwell that the task in question either had been or

soon would be completed.  Stokes explains that these e-mails often delayed the completion of his assigned work and hypothesizes that they were motivated by Blackwell's desire to "creat[e] a paper trail" for the purpose of terminating him at some later date.  Id.  Finally, Stokes recounts an incident where he was unduly criticized for errors, including "font size shifts[] and ... several misspelled words," in charts that he helped create.  Id.

Fifth, Stokes alleges that his supervisors set unrealistic goals for him and otherwise overburdened him with assignments.  Specifically, he reports ten instances between July 28, 2009, and June 2, 2011, or less than one incident every two months, where a supervisor requested that he, or a member of his team, complete a specific task that was outside the normal routine.  For example, on March 3, 2010, Blackwell "e-mailed the group, asking when the ledgers were open."  Stokes submits that, as a supervisor, Blackwell should have known this information.  Nevertheless, by asking the question, Blackwell forced

6

him to "look up the answer and take time to answer [it]."[3]
<u>Id</u>. at 4.  Similarly, on September 9, 2010, Blackwell e-
mailed the group and requested that one of them
investigate a security issue.  Since Stokes lacked
security access, he informed Blackwell that he would be
unable to complete that task and one of his colleagues
would therefore have to handle it.  According to Stokes,
responding to Blackwell's e-mail "took time away from
work on [his other] assigned tasks, thus adding pressure
to meet [his] deadlines."  <u>Id</u>.  The other instances
Stokes complains of are similar to those described above,
and so there is no need to address them individually.

Sixth, Stokes submits that Blackwell would often
ignore his e-mails, sometimes taking as long as four days
to respond.[4]  This delayed Stokes's ability to assist

---

3.  Stokes does not explain how long answering this
question took or why Blackwell should not have asked him
questions, such as this one, that were directly related
to his job responsibilities.

4.  Most of the specific instances of delay occurred
between December 2008 and May 2009, well before Alfa
(continued...)

others with the problems that they had brought to his attention, thereby damaging his reputation.

Seventh, Stokes alleges that Blackwell once deleted information from his task-management program.  Stokes believes that this was "an attempt to cover up or hide something," but does not explain what that "something" was or how it was connected to his EEOC complaint.[5]  <u>Id.</u> at 9.

---

4.  (...continued)
received notice of Stokes's EEOC complaint. Nevertheless, because this behavior allegedly continued into the relevant time period, the court has addressed it as part of Stokes's complaint.

5.  Stokes's affidavit is riddled with numerous other accusations that, for one reason or another, do not make their way into his brief.  For example, Stokes alleges that he was asked to refrain from copying his attorney on internal e-mails and to cancel some scheduled appointments that conflicted with his assigned job responsibilities.  Similarly, Stokes complains that his birthday and ten-year anniversary of service with Alfa were insufficiently celebrated.  None of those allegations, either individually or in the aggregate, demonstrate a prima-facie case of retaliation.

III.

To establish a prima-facie case of retaliation under either Title VII or § 1981, Stokes must demonstrate that (1) he engaged in protected activity; (2) he suffered a materially adverse-employment action; and (3) there was a causal connection between the protected activity and the adverse-employment action.  <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006); <u>Crawford v. Carroll</u>, 529 F.3d 961, 970 (11th Cir. 2008).  An action is "materially adverse" if it might dissuade "a reasonable worker from making or supporting a charge of discrimination."  <u>Burlington</u>, 548 U.S. at 67; <u>see also Gant v. Kash'n Karry Food Stores, Inc.</u>, 390 F. App'x 943, 945 (11th Cir. 2010) (per curiam) (applying "materially adverse" element to both Title VII and § 1981 retaliation claims).

The "materially adverse" requirement is designed "to separate significant from trivial harms," only the former of which are actionable.  <u>Burlington</u>, 548 U.S. at 68.  In

9

the retaliation context, an "employee's decision to
report discriminatory behavior cannot immunize that
employee from those petty slights or minor annoyances
that often take place at work and that all employees
experience."  Id.

While Stokes engaged in protected activity when he
filed the EEOC charge, his retaliation claim fails, as a
matter of law, because, with one exception discussed in
more detail later, he has suffered no materially adverse-
employment action.  The vast majority of his grievances
are precisely the type of minor annoyances that fall
outside the purview of federal employment-discrimination
law.  See Oncale v. Sundowner Offshore Servs., Inc., 523
U.S. 75, 80 (1998).  Stokes's most frequent complaint is
that his supervisors routinely e-mailed him additional
assignments, some of which were outside the traditional
scope of his responsibilities, and others of which his
supervisors could have handled themselves.  Stokes also

finds fault in his supervisors' close scrutiny of his work and their failure to recognize his accomplishments.

No doubt every reader of this opinion has experienced similar treatment in the past. Demanding bosses are the norm. Hard work often goes unnoticed. Managers frequently misunderstand the technical details of the jobs that come naturally to their employees. These conditions, whether considered individually or in the aggregate, are simply not actionable under Title VII or § 1981; otherwise, every employee in the United States would have an arguable claim.

Stokes's remaining allegations are similarly unavailing. Only actions that might reasonably dissuade an employee from filing an EEOC complaint, including termination, demotion, a decrease in wage or salary, a change in title, a material loss of benefits, significantly diminished responsibilities, formal reprimands, and other actions that might be unique to a particular situation, are considered materially adverse.

11

See <u>Malladi v. Brown</u>, 987 F. Supp. 898, 915 (M.D. Ala. 1997) (Thompson, C.J.) (citing <u>Rabinovitz v. Pena</u>, 89 F.3d 482, 488 (7th Cir. 1996)).   But Stokes does not allege any behavior of that sort.   There were no threats during the relevant time period, no demotions, and no material changes in his job responsibilities.   Indeed, throughout the pendency of this action, Stokes has continued his employment at Alfa and enjoyed his 2.75 % raise.

Two of Stokes's allegations, however, do warrant special attention because, under other circumstances, they might be considered evidence of an employer's intention to create an inhospitable work environment actionable under Title VII and § 1981.

First is Stokes's allegation that he was berated by Forsythe for filing a lengthy rebuttal to his 2008-performance evaluation.   Even putting aside that all of the admissible evidence in the record indicates that Forsythe was unaware of Stokes's EEOC complaint at the

12

time and that Stokes readily admits that this reprimand
was motivated by his rebuttal and not by any EEOC
complaint, a factfinder would have to conclude that the
reprimand cannot be considered an adverse-employment
action.[6]   The Eleventh Circuit has explained that "the
decision to reprimand or transfer an employee, if
rescinded before the employee suffers a tangible harm, is
not an adverse employment action." Pennington v. City of
Huntsville, 261 F.3d 1262, 1267 (11th Cir. 2001).   Stokes
has identified absolutely no adverse consequence
resulting from this reprimand.   Absent any consequence,
a reprimand for behavior wholly unrelated to the filing
of an EEOC charge would not reasonably dissuade an

_____

        6.   Forsythe's unawareness of Stokes's EEOC complaint
serves as an independent reason to reject any retaliation
claim predicated on this reprimand.   Raney v. Vinson
Guard Serv., Inc., 120 F.3d 1192, 1197 (11th Cir. 1997)
("[W]hile we have held that awareness of protected
expression may be established based on circumstantial
evidence, our cases have required plaintiffs to show a
defendant's awareness with more evidence than mere
curious timing coupled with speculative theories.").

employee from filing such a charge.  It therefore cannot

constitute an adverse-employment action.

Second, Stokes alleges that certain company policies

were not fairly applied.  For example, he alleges that

Delong was permitted to wear jeans on multiple occasions,

even though doing so violated Alfa's dress code.  But

Stokes concedes that he never had any problems with the

dress code and was never reprimanded for noncompliance.

That Delong was permitted to wear jeans to work does not,

by itself, show any retaliatory mistreatment of Stokes.

Similarly, Stokes maintains that his hours were more

closely scrutinized than those of his colleagues.

Specifically, he was forced to maintain a 40-hour-work

week and have his vacation time pre-approved.  Even if

these conditions could constitute an adverse-employment

action, Stokes readily admits that Alfa took these steps

only after he began having trouble arriving to work on

time and limiting his lunch break to one hour.  There is

absolutely no evidence anywhere in the record that Alfa's

monitoring of Stokes's hours was retaliatory or motivated by anything other than a desire to ensure that Stokes met the company's expectations regarding the appropriate length of the workweek.  Without such evidence, Stokes's retaliation claim, so far as it is predicated on Alfa's monitoring of his hours, must fail.  <u>See</u> <u>Holifield v. Reno</u>, 115 F.3d 1555, 1567 (11th Cir. 1997).

At the pretrial conference held on November 2, 2011, Stokes's attorney suggested that, even if none of Stokes's various allegations, when considered separately, constitutes an adverse-employment action within the meaning of Title VII or § 1981, their cumulative effect would dissuade a reasonable employee from filing an EEOC charge and therefore, together, they constitute an adverse-employment action.  There are two problems with this theory.

First, to establish a prima-facie case of retaliation, a plaintiff must show that "there was a causal connection between the protected activity and the

adverse action." <u>Howard v. Walgreen Co.</u>, 605 F.3d 1239, 1244 (11th Cir. 2010). Therefore, when assessing whether the cumulative impact of Alfa's various wrongs constitutes unlawful retaliation, the court can consider only those actions motivated, at least in part, by retaliatory animus. Plaintiffs would otherwise be able to circumvent the causation requirement simply by alleging multiple, isolated instances of mistreatment untethered from any protected activity and then asking the court to consider them in the aggregate. In this case, Stokes has failed to draw any causal connection between the vast majority of the complained of behavior and his EEOC charge.[7] The court is therefore unable to rely on the aggregated effect of his various allegations in determining whether Alfa took an adverse-employment action against him.

Second, while this death-by-a-thousand-cuts approach might carry the day when an employer, motivated by

_____

    7. This provides a sufficient, independent reason to reject Stokes's retaliation claim.

16

retaliatory animus, actually breaks the skin on one or two occasions, see Ekokotu v. Fed. Express Corp., 408 F. App'x 331, 339 (11th Cir. 2011), here none of the alleged wrongs so much as left a bruise.  Therefore, even if considered in the aggregate, Stokes's accusations do not describe working conditions severe enough to entitle him to relief under federal law.

\* \* \*

In order to maintain a retaliation claim, the plaintiff must demonstrate that his employer took some adverse-employment action against him.  For the most part, Stokes has failed to demonstrate any such action.  In the one instance where he may have shown adverse treatment actionable under Title VII or § 1981, that treatment was indisputably a response to his own misconduct and was in no way retaliation for filing the EEOC charge.  Thus, for the foregoing reasons, the court concludes that summary judgment should be granted in

favor of Alfa and against Stokes on his retaliation claim.

An appropriate judgment will be entered.

DONE, this the 9th day of November, 2011.


                    /s/ Myron H. Thompson
             UNITED STATES DISTRICT JUDGE